On November 24, 2014, there was an explosion on one of the seven boosters at QVC Bank, provided, manufactured, designed, and sold by UE in this matter. Admittedly, that was some 15 months after the delivery of the boosters, but certainly well within the statute of limitations from the state of Texas. It is Baker Hughes' position that the explosion was caused by the improper initial selection of a ball valve in conjunction with UE's deficient configuration of the Stage 3 discrepancy. I would ask the Court to take a look at Document 30 at pages 13 and 14 and page 19, where those facts are not in any way disputed by UE. That's the subject of the summary judgment record that is before the trial court judge. There's no dispute either in what the contract was. The contract was comprised of four different exhibits. The logic terms, which would control, except in the event that the supply agreement trumped them. Baker Hughes' specification, UE's quote, and the overarching agreement was obviously the provision of seven boosters that could handle multiple compressants, and by compressants I mean not only saturated air, dry air, nitrogen, natural gas, but also, importantly for purposes of this case, they had to be able to be used worldwide. The CE mark, which is addressed in our pleadings and also in the briefs here, is something that's actually required in order to use those boosters in the European Union. The what? The EU? Yes, sir, but what is it that's required? A valid CE mark. What's a CE mark? A CE mark is addressed in, I think it's page three of the quote, which I provided to the panel this morning. Well, we're in Australia, so what? Yeah, well, the evidence, the evidence drawn in the summary judgment record is these boosters were going to be used initially in Western Australia, but the intended purpose for these boosters from Baker Hughes' standpoint was they would be used all over the world. Okay. The non-conformities that we've talked about in the body of the summary judgment evidence relate to both UE's referable to the goods. What's significant about the CE mark is there's two directives that needed to be applied when you're designing these kind of things. There's the pressure equipment and the machinery directive, and what we learned incidentally in discovering this matter is that UE never did that. They never applied either directive in an effort to make sure that a booster like this would not explode. Where's that referenced in your briefs? It's page four of the quote, and it's in the briefs, certainly in a reply brief at page 14. Yeah, well, this is what I found very odd about the case. First of all, your complaint is about six pages long, and so when you start talking about provisions of the contract that were breached, I was sort of, you know, you didn't quote them or reference them, and then just as to the technical data, all I knew here was that it was a drain system and a ball valve, so the briefs were surprisingly bereft of specifics, which may have come, and at some point you said, oh, that was all developed in summary judgment. Well, you're leaving a lot to our imaginations, I suppose. Well, I certainly don't want to do that, Your Honor, so I'd like to direct your attention to the interrogatory answer that was provided that was the state of the record at the time, and it clearly said what Baker Hughes' problems were. Well, I don't think they'd deny that there was a flaw in the makeup of this particular, that something went wrong with this compressor. Yes, and it's our contention, Your Honor, that what went wrong is they didn't do the necessary test in order to get a valid CE mark because they didn't do the directive work, which necessarily led to an explosion such as this that blew this man's hand off. Well, so there's an express warranty provision, and that's what the judge ruled on, so what's your position on that? Well, again, we brought claims in implied warranty as well as express warranty, and we think there are express warranties in the contract that the trial court didn't address, specifically 4.1, 4.2, and 9.2, and the reason those are important, Your Honor, is if you look as to whether or not you had adequate personnel for the job according to Section 4.1, look no further than in this record, 1691 and 1692, where Ryan Bedford, who was the employee at UE who was charged with doing this work, had never done an air booster before. He had done natural gas boosters, but he had never done any air boosters. Furthermore, 4.2 requires that they use due care and due diligence. In this case, Your Honor, it's not a situation where they did the work. They admittedly didn't do the work. We think that's a violation of 4.2. What wasn't done? They never applied either of those directives in the test required to make sure that a product like this booster would not explode. It's our position that adiabatic compression caused this explosion and caused the injury to the man's hand. How come you didn't say any of that really in the briefs? I mean, that's so mis... But with all due respect, Your Honor, I think we did. I mean, we addressed the interrogatory answers. I don't remember anything about the CE mark or any of that, at least in the blue brief. And the interrogatory answers only come up in the reply brief. Yes, Your Honor. But it was clearly part and parcel of the whole argument before the trial court. And the way the court gave it short shrift was they said, well, two things. One, you have an exclusive warranty. We don't necessarily disagree with that. We think that only addresses an optional warranty if we decided to address it, which is you can correct the boosters if need be. We chose not to avail ourselves of that optional or cumulative remedy. What we were seeking was damages relating to the deficient character of each of these seven boosters because they were all designed and configured the same. The other thing that we found troublesome is the court's unsolicited opinion that there was precise and complete specifications that would mean that somehow UE was excused from doing the design work, which in his quote, and I've highlighted that for the benefit of the court, they agreed to do. These specifications were anything other than precise and complete. As I previously told the court, the V8 specification did not specify the type of valve nor did it specify the way these pipes were going to be configured. Were you surprised that there was a ball valve in the booster? I don't know. Was your client, I'm sorry. No. When they went to do the FATS, the on-site delivery testing, was it not, was it somehow, I mean, there are record citations in the red brief that specifically say this was discussed. Should we use a needle? Should we use a ball? I'm glad you brought that up, Justice Sullivan. The needle valve didn't come into any discussion until they had the FAT test in Colorado before they went over abroad. So the needle valve was not something that was discussed instantly. The only discussion of the needle valve was what are they going to do now that there's this FAT test is done. So if you're looking at the warranties of merchantability, which are on the date of delivery, there was no needle valve. It was a ball valve. And again, Your Honor, the simple use of the ball valve by itself is probably not deficient. The fact of the matter is, though, the way they designed the configuration of the drain lines in conjunction with the ball valve. But isn't that, so what's the relevance of the retrofit kits? So, I mean, I understand that there was a discussion between the two parties. So, I mean. It's relevant at this stage of the proceeding. I'm sorry, I mean to the defectiveness of the booster. I mean, my understanding, again, not having gone through all the engineering of exactly how this booster thing works, the way that the parties have presented it, is that there was a recognition that there was a potential issue with the valve. And that was discussed. Should we use a ball? Should we use a needle? Admittedly, it was after the design, but it was before you took delivery, your client took delivery of the product. And then two, there was also a discussion about the drainage. And there was, it sounds like, if you're talking about in contract terms, offering acceptance to produce these drainage kits, these retrofit kits that would somehow allow the booster to drain properly and were never installed by your client. So, it strikes me as it is relevant to the defectiveness of the product. Well, I would suggest to you that it's not. And here's why. Because if you look at the four documents that are part of the contract, there's absolutely no reference to the retrofit kits. So, what you're trying to figure out is was there a breach of an implied warranty merchantability, which is what we think is important. The retrofit kits, in our opinion, are irrelevant. It was never made part of the contract. There's no amendment to the contract referencing those. Would you dispute that they produced them and that they gave them to you or sold them to you? I'm not sure if there was consideration separate and apart from your original contract for them. No, Your Honor. I don't dispute that we got them at some point in time. Obviously, there's some arguments, but more importantly, some factual reasons why they weren't put into place. So, there's no dispute that you were given them, and there's no dispute that you didn't use them. Is there a dispute as to whether it would have changed the outcome as to if you had installed them? Absolutely. And what's the evidence of that dispute? That dispute is not here on this record because we never got a chance to make that dispute, Your Honor. And remember, you need to understand, 28.4, which is what they're talking about, is not relevant either. It's our position that 28.4 only excuses UE from making repairs if, in fact, Baker Hughes decided to make repairs. And the problem here is we never got a chance to do that. I mean, we were shut down by Chevron, our customer. We were shut down by the government, and we went into investigation mode after that. So, Your Honor, you've asked me, Judge Jones, hydroponics is the case we cited to the court, which we believe stands for the proposition that even an exclusive special warranty does not negate the implied warranty of merchantability. Where does hydroponics come from? Where does that case come from? You cited it. I forget. It's a district court case? It's a Fifth Circuit case, Your Honor. 1972. I think it's a per curiam opinion. And we also have cited the court to Judge Higginbotham's opinion in Reynolds Metals. And this is why, Judge Oldham, it's important to understand— Reynolds Metals is distinguishable on its facts, in my view. The contract breach there was completely different from the implied warranty argument, in my view. Well, the way we read Reynolds Metals is, if you remember the engineer there, Engineer Rindell, they had no idea when they took possession of that product, Your Honor, that Engineer Rindell had done anything wrong. If you look at the third page of that opinion, Judge Higginbotham says, but look, he didn't ground that transformer properly. They found that out after the fact. And Judge Higginbotham allowed them to prosecute a breach of contract case. Well, that's fine. But there was a provision of the contract that said they were going to send an engineer to the site to do X. And then they treat it as a deficiency in goods and a sale of the contract. So I can see where you could have one warranty that applied to the goods themselves and not exclude fitness for a particular purpose or merchantability for purposes of the rest of the contract. I mean, that's theoretically possible. I'm not so sure how it's possible on the facts here. Well, that's what 4.1, 4.2, and 9.2 are, Your Honor. That's what sets out what it was that— I mean, I share the mystification of the district judge, which was plaintiff failed to allege breaches of specific contractual provisions in its original amended complaints and considered those claims as alleging general defectiveness of the boosters. I mean, doesn't a specific provision in a contract normally overcome the general ones? Well, the fact of the matter remains is that these were pled. No, they weren't pled. All they pled was breach of contract. Right, and in that contract, Your Honor, I think if you look at the language and compare it to these three paragraphs, it's the same language, albeit in an abbreviated form. And then one of them, I mean, if you take them one by one— and I should have had them here with me, which I screwed up on— 4.1 just said what? Adequate personnel for the job, which would be Ryan Bedford. Well, and you're now saying he was inadequate? Yes, Your Honor. Okay, and 4.2? All due care and diligence with skill to be expected of a reputable, experienced contractor and the boosters are fit for their intended purpose. And that provision, warranty for fitness for a particular purpose, is only if the buyer is relying on the seller's skills. And I thought that there was another provision that applied only if UE is responsible for the design. And their evidence, which they cited at length in their brief, is that Todaro and a bunch of UE Baker Hughes people were on the scene carefully instructing UE about how to build these things. Well, let's make sure you and I are on the same wavelength. I think what they're referring to is Section 4.3. All right. What 4.3 specifically says is except as expressly specified in the contract. So when you look at those four pieces of paper that comprise the contract, and there's no dispute about that, they take on the design obligation. That's what the quote is, Your Honor. There's no... Well, it seems to me it all turns on what design is. Not what is is, but what design is. Because you can say, I want you to design and build seven compressors. But then you say, in practice, we're going to tell you what to do every... It's like the architect and the homeowner. And I find it hard to believe on the facts of this case that you are the homeowner telling that you are the architect totally dependent on the homeowner to tell you how to design the electrical supply to the house. Significantly. Our position is that they did not design this properly insofar as they used a valve valve with the configuration of the drain that was such that you couldn't open up that valve valve slow enough in order to cause a potential problem with adiabatic compression. What the trial court judge said is, we gave them precise and complete specifications. It's uncontroverted. I've given you the sites where they acknowledged it. There was no specification for a manual valve. Well, those are all very... You're talking about those general deposition things? They didn't design it or we didn't... Yeah, they didn't design it. I'm talking about the quote itself, Your Honor. If you read the quote and it talks about the CE mark and it talks about all the other things they were supposed to... Again, this is news to us today. The CE... I mean, that reminds me of the cutie mark on my little ponies. But I don't... This is all news to me today and I did read the briefs. I'm sorry. I guess I didn't read them well. Well, I have one question. Yes, you've acknowledged, I think I heard you, that under 4.3, design is not UE's responsibility unless expressed in the contract. So not based on customer conduct. It's got to be in the contract. Just tell me quickly, what provisions of the contract would you have us look at to over... The quote. The UE quote, which I've provided to you all. Okay, and that's what you're limiting to that? Yes, sir. Well, I mean, I'm not limiting it to it because there's testimony from a corporate rep... I understand, but you've conceded that's got to be in the contract. I think you've acknowledged that's got to be expressly specified in the contract. And so what you're telling us is to look at the quote. Yes, sir. Any other questions on that? No, sir. You have time for rebuttal. Oh. Sorry. We gave you a little extra. I appreciate it, ma'am. Thank you. Mr. Young. May it please the court. Baker Hughes is suing UEC for an alleged design defect in the boosters in question. But the contract for the boosters stated that UEC would not be responsible for the design of the boosters. Baker Hughes has two purported answers to this point. First, it argues, as you've just heard, that the contract expressly specified that UEC would have design responsibility. But it points to only two provisions in support of that contention. First, a statement in the specifications listing the codes and standards generally applicable to design, materials, manufacture, installation, testing, inspection, stamping, certification, and documentation of the work. And several references in the quotes to how the product is designed. These fall far short of what the contract requires, namely an express contractual allocation of design responsibility to UEC. To say that the boosters are designed to do this, that, or the other is not to say we are responsible under this contract for the design. To say that the following laundry list of specifications as to this other laundry list of aspects of the work apply falls far short of saying UEC is contractually responsible for the design. And contractual responsibility is what we're talking about. If you look at the definition of the term work, which is a defined term in the contract, it refers to work which the contractor is required to do under this contract. So those dovetail both the statement in 4.3 about responsibility and the definition of the work in 1.23. It was fully consistent for Baker Hughes to have responsibility for the design and for UEC to assist Baker Hughes in the development of the design. The analogy might be that the law allocates responsibility for the design of this court's opinions to the judges of the court, even though they may draw upon their law clerks to assist them in that design. The ultimate responsibility maintains the same. The contractual allocation of design responsibility to Baker Hughes cuts through all of the pled causes of action. It means that there is no breach of contract liability for defective design. It means that there are no express warranties against defective design. It means that all the implied warranties against defective design are categorically excluded under UCC 2316 C1. Well, excuse me, but aren't you backing yourself right into fact issues about what's the scope of the Baker Hughes design with the UE assistance in design? Why are there not fact issues about those respective responsibilities? Well, because it is responsibilities allocated by the contract, expressly specified in the contract in the words of 4.3. So there's no fact question about what was or wasn't expressly specified in the contract. There may be some fact questions about who factually did what aspect of the design, but that's not the standard. The standard is contractual allocation of responsibility. That is measured within the four corners of the contract, and there are no fact questions about that. All of this means that the court could stop here without examining any of the other reasons for which specific causes of action were rejected. Those are set forth in our brief. I don't propose to go into great detail on all of them today. I would just make a few points. First of all, on breach of contract, we have this court's Luig v. North Bay Enterprises case where the court mints no words in saying that under Texas law, damages are only permitted under a breach of contract cause of action when the seller has failed to deliver the goods, the buyer has rejected them, or the buyer has revoked his acceptance, none of which occurred in this case. So that is a published opinion of this court, and we believe is the beginning and the end of the breach of contract claim. There were also, as the court has alluded to, no specific breach of contract claims pled. Mr. Bracken says under Texas law, there was no such pleading requirement. We are, of course, in federal court, governed by an Iqbal standard, not Texas pleadings. Well, we're not talking about 12B. We're just talking about the arguments. That's correct, Your Honor. But if you look at section 36.5B of the contract, it requires that a claim set forth these specific contract provisions violated. So whether you go by a 12B standard or by that standard or by Judge Gilmour's prior opinion where she says you can't take a 40-page contract and generally claim breach of contract and then reveal your specific sources at summary judgment. Was all this about the CE mark and the adequacy? I mean, I gather the parties agreed the ball valve failed in some way, but the CE mark or whatever, was that all brought out during discovery? First of all, I'm not sure the parties did concede that the ball valve failed. We'll get into that a little bit if we go to spoliation. But the CE mark was really not addressed at any level of detail in the district court. The CE mark itself might, for example, or the absence of it, might, for example, have precluded the transfer of this product to the European Union. But that would be a potential breach of contract claim divorced from any defect. What we have here is the question of all roads lead to a design defect and Section 4.3 disclaims responsibility for design defect and the acceptance of the goods negates any responsibility for design defect arising except through the law of warranty. Can I ask a sequencing question about the communications in this document that your friend on the other side provided to us? So this is the UEC quote. I assume he gave a copy of it to you as well and I'm sure you're familiar with it. Yes. The way that the contract was formed, did it start with a Baker Hughes specification a response was the UEC quote, that is this document from December 15th of 2011 that was then accepted? Is that the deal? It started with three things which roughly correspond to the first three parts of the contract. The four parts are the supply agreement, the second part of the so-called logic terms, which is the template contract, the third part is the specifications, the fourth part is the quote. So I remember that. It started as the first three. The first part of that, the supply agreement in its initial form is not exactly the same as in the final contract. The second and third parts are the same. So essentially there was a bid package consisting of the first three parts and then the UEC quote was the fourth part. So the UEC quote, this document that we have in front of us came at the end or at the beginning? Well, at the end, well, in the midst of the contract negotiation process, it was UEC's response to the bid. That's what I was looking for. And then apparently, although the record doesn't reflect the details of this, there was some back and forth because some of the detailed terms in the first part of the contract differed from the bid package. But this document is part of the contract between the two parties? It's part of the contract, all four parts. I'm looking at page 1619, the record stamped page. It's page eight of the UEC document. It's page 1619 of our court of appeals record. And it specifically says that your client agreed to provide a ball valve. Manual full port quarter-term ball valves are provided at the package suction and discharge and explains easy access for the operator. So I don't understand why, I realize this is probably a question for the appellant, not for UEC, why we're talking about breach of contract as to the ball valve. It seems like this was part and parcel of the agreement from the very beginning. Am I misunderstanding the way that it was? I think, I'm not sure if that's the same ball valve. There were different ball valves on different parts. Some ball valves on the input. This was on the drain from the condenser units. So this one says that it's for easy operator access, which I gathered is the whole reason that this young man had the injury was because he was operating this valve. Is that? He was operating the valve. You're saying it may be a different valve than the one that was there? I think it is, but what the record does reflect as to this ball valve is that when the discussions came up in Denver about this is draining an awful lot of fluid, it's going to require operators to frequently operate the ball valve, this is a problem. UEC suggested the use of a needle valve like you would have on your garden faucet, which could be cracked open so that there would be a continuous slow drain and that Baker Hughes, through Mr. Barden and Mr. Tadaro, said we don't want to do it that way. And that was when the alternative was identified of having an automatic dump system. Unfortunately, it was too far in the process for that to be implemented in the original, the first six boosters and that led to the retrofit Kedson. Excuse me, did Baker Hughes, let's see, I keep, I keep, okay, never mind. Just a couple of brief points on the issue of displacement of warranties versus disclaimer of warranties. Baker Hughes makes much of the absence of express mention of disclaiming of the warranty merchantability and of conspicuousness and so forth, but we are not relying on such a disclaimer. Instead, what we're saying is that the express allocation of design responsibility to Baker Hughes is essentially the equivalent of as to warranties, excuse me, as to design defects, this product is as is. We're relying on Baker Hughes for that and so we're relying on section 319 of the UCC in that regard. What's your best, what's your best, you're relying on the comment to 319, right? Well, we're relying also on the text of 319, Your Honor, where it says, express warranty, no, I'm sorry, it's not 319, it's 316C1, all implied warranties are excluded by expressions like as is with all faults or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. Contractor shall have no design responsibility is about as clear as you can get that as to that aspect of the goods, there are no implied warranties. We are not saying there are no implied warranties in this contract whatsoever. If we had had a manufacturing fault, That's what the district court said. Well, because this is a design defect case, if there had been a manufacturing defect or I suppose a marketing defect, there was an operator's manual that had an error in it or something, that would be something not covered by the 4.3 exclusion of design responsibility. And that would be something where there would be implied warranties. There's none of that involved in this case. There is no claim that any part of this... Is that the way you argued it to the district court? We didn't mention specifically the distinction between design warranties and non-design warranties because this has been from beginning to end a design case. I'm merely using that to point out to the court the difference between a disclaimer of warranties and a displacement of warranties. Mr. Bracken didn't touch on the spoliation question and I'm going to touch on it only very briefly because, of course, if the court affirms the summary judgment, then the spoliation instruction becomes moot. We believe this is a case where in the totality of the evidence, there was room for the district court to infer the necessary findings to support the spoliation instruction. First, as the foreseeability of the claim. Second, as to what this court called bad faith or bad conduct. And third, as to prejudice to UEC. First, if you look at the timing on foreseeability, in fact, at the time of the destruction of the ball valve, the investigation was in full force. UEC had been placed on notice by Baker Hughes. They were focusing at that point on explosion in the drain system. They had been told that their workbook, whatever that means, for the investigation would have to be reviewed by legal counsel before it was finally released. And they were on the verge, less than about 10 days later, of telling UEC that the product was not fit for purpose and they were expecting UEC to remedy the problem. As to the bad faith or bad conduct element, the destruction was not by some low-level official. It was by Liam Malia, Baker Hughes repair and maintenance supervisor for all of Australia, a person who ought to have known of the importance of the ball valve. The destruction was intentional. It was not accidental. There was no effort made to document the process. And finally, as to prejudice, UEC's expert testified that the intense heat involved in the destruction of the valve caused the rubber or plastic seals to adhere to the surface of the valve. And more importantly, it destroyed any so-called witness marks that might have shown the position of the valve at the time of the explosion. The position of the valve was highly relevant because unless the valve was comparatively wide open, there was no opportunity for the adiabatic compression that Baker Hughes alleges was the source of the explosion. What does the word adiabatic mean? How do you spell it? What does it mean? I had to go back to my MIT days to remember that adiabatic means without the opportunity for dissipation of heat. What the Baker Hughes theory is... It popped like a balloon. Well, no, jammed together like a bicycle pump. On the upside of this valve was 120 atmospheres worth of pressure. On the bottom side of this valve was one atmosphere's worth of pressure. If you open the valve suddenly, the high-pressure air compresses the low-pressure air before it has a chance to get out of the way. When you compress something, it heats up. Baker Hughes' theory is the valve was opened widely, rapidly. This compression occurred. The heat built up. It kicked off the explosion. So in any event, we believe that the trial court properly granted its summary judgment, mooting most of the spoliation question other than the monetary sanctions, and that if the court had occasion to reach the spoliation instruction, that was within the district court's fact-finding power and not an abuse of discretion. I'd be happy to answer any questions. Otherwise, that concludes my argument. Okay. I guess we don't have any. Thank you. Mr. Bracken, when you're ready. Yes, Your Honor. Judge Jones, I direct the court's attention to pages 33 and 34 of our initial brief that we filed that addresses the CE mark and the significance of the CE mark from Baker Hughes' standpoint. With regard to the contract. Judge Oldham, you asked some questions about the design and what's in the quote. Those are all very good questions that maybe a fact finder should decide, which is what was the nature of the design obligations? And when we pointed out in our summary judgment, it was UE that changed their quote, Your Honor, to address design. The testimony, unconverted testimony in this record from Mr. Brigham, who was their consultant at the time, was they took the form and modified it to say on numerous occasions that they were going to be involved in the design. But again, they want to say they did only so much, but there's no question that they knew what our complaint was. There's no reason to be surprised, and that's why nobody filed a 12B motion or anything. Because if you look at their summary judgment that we're hearing about today, page 19, Baker alleges that the use of a ball valve on the manual drains in the drain lines configuration, quote, led to the rapid compression causing the explosion. And what did they cite? They cited our interrogatory answers I referred to the court earlier. The trial court said, Wow, this is surprising. I had no idea what was going on. The parties knew exactly what was going on. We had fulsome discovery. You didn't hear anybody. There's not anything in this record where UE says, Geez, we don't know what the claim is here. I don't think we're going to be able to respond to this. So that's a red herring in my mind, because everybody knew what was at stake here. Again, the needle valve issue, again, Justice Oldham, something that I'm sure a jury would like to hear about, because to me, it sounds more like causation than it sounds like breach of contract. Because as I told you before, and you haven't heard anything differently from the opposition, that's not part of the contract. So what you're trying to do is- Can you talk to a language of 4.3? Yes, sir. What I heard from you is that in the quote, UE made very clear that it's going to be involved- Yes, sir. In design. But what 4.3 is talking about is responsibility. What's the best language you have in the quote that UE is actually, essentially, what you might say, is overturning the strong presumption laid out in 4.3? It's what's not there. And what's not there is language- No, but the 4.3 says you've got to express. It's got to be there. Let me finish if I might. We all know what the law in the state of Texas is if you're trying to disclaim or get out of a warranty. You use language such as sole and exclusive. You won't see the word sole. You won't see the word exclusive anywhere within the body of these contracts. The other thing that this panel is well aware of, if what you're trying to do is limit your remedy or you want to get rid of implied warranties, you have to specifically say the implied warranty of merchantability is gone. It's been disclaimed. And it's got to be in writing. It's got to be conspicuous. Nothing like that's there. The Trot Court found that the implied warranty of fitness for a particular purpose was displaced. But there's nothing in the agreement that says that. And that's why we quoted the court to Justice Higginbotham, Reynolds Metals, because what happened here is, yes, we got the boosters. Yes, the boosters went to Western Australia. They sat for a long time before they were actually used. But what we found out was that they hadn't done what they said they were going to explicitly do in their quote. And that was to get us a valid CE mark, which necessarily meant that they would have to go through testing to make sure that this kind of adiabatic compression, Your Honor, wouldn't happen. And it didn't happen. And to add insult to injury, they used Ryan Bedford, who had never done this, as their point person. So in direct answer to your question, Justice Ho, I think that that's what happened. If you read the quote, they're taking ownership of certain parts of the design phase. And there's nothing in this contract that says we're somehow limited to that particular paragraph. Well, let me ask you a question. Is the CE mark something that is, like, engraved onto the equipment? How do you know that whether there is or is not a CE mark? I think it comes with a wrapper warranty that you have on location. It's much like an IEDC stamp. But candidly, Your Honor, I'm not entirely sure. Well, it says mark, so I thought it must be visible to the naked eye somehow. I would think so, but I don't know that for a fact, Your Honor. And I hate to tell you something I don't know about. Well, and that being the case, it would have, I mean, with that assumption, it would seem that Baker Hughes would have been able to ascertain immediately on delivery of the goods whether they conformed to the contract or not. There's nothing like that on the record, Your Honor, one way or the other. I mean, the representation was it would comply with the CE mark and it didn't. So that's why we're here. With regard to the spoliation, if I might run just a tad bit over, the notion of monetary sanctions here is laughable. The parties went over to Australia, our respective or their expert, to look at the boosters. It wasn't that they went over to look at this particular ball bell. It's uncontroverted in the timeline that we provided the court. They got it FedEx or in some other fashion immediately thereafter. It was tested their satisfaction. At the hearing, I would ask the court to take a look at the transcript. There's no finding of bad faith. There's no even clear and convincing evidence of bad faith. You heard testimony from Mr. Melia in his affidavit that says I had no idea that there was an issue here with regard to anything other than the investigation. We were required by the authorities in Western Australia to perform an investigation. That's what we did. That's what our customer asked us to do. That's not bad faith under any stretch of the imagination. How much... What was the amount of damages or what do you estimate? Damages of the... Foliation. No, I know the other is millions of dollars. I think the trial court awarded $12,000. $12,000. Yeah, which was, I guess, a fraction of the cost. It's a dignitary injury. Ma'am? It's a dignitary injury, $12,000. Yeah, but more importantly, we had a mandatory instruction which this court has previously said is not something that... Well, the instruction is another matter, but... Yes, Your Honor. And honestly, we think we've proven by the summary judgment record that they did, in fact, design certainly parts of these boosters, but in the likely event that the court doesn't find them in the record, we ask that the court remand this case for further proceedings so we can make some of these arguments to the jury, Your Honor. Thank you. All right. Thank you, sir. Any further questions from the panel? No. Appreciate it. Am I excused?